No. 121,150

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ALVA BRYANT MCKINNEY,
*Appellant*.

SYLLABUS BY THE COURT

1.

When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.

2.

A statute's constitutionality is a question of law subject to unlimited review.

3.

K.S.A. 2020 Supp. 21-6301(a)(13), which prohibits the possession of any firearm by a person who is or has been a mentally ill person subject to involuntary commitment for care and treatment, does not violate either the Second Amendment to the United States Constitution or section 4 of the Kansas Constitution Bill of Rights, under the arguments presented by the appellant in this case.

1

Appeal from Jackson District Court; NORBERT C. MAREK JR., judge. Opinion filed January 29, 2021. Affirmed.

*Jennifer C. Bates*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., HILL and BUSER, JJ.

MALONE, J.: Alva B. McKinney appeals his convictions of reckless aggravated battery and criminal use of a weapon. McKinney claims there was insufficient evidence to support his reckless aggravated battery conviction. He also claims that K.S.A. 2020 Supp. 21-6301(a)(13), which prohibits the possession of any firearm by a person who is or has been a mentally ill person subject to involuntary commitment for care and treatment, violates the Second Amendment to the United States Constitution and section 4 of the Kansas Constitution Bill of Rights.

We find under our standard of review that the State presented sufficient evidence to support McKinney's reckless aggravated battery conviction. We also find that K.S.A. 2020 Supp. 21-6301(a)(13) does not violate our federal or Kansas Constitutions under the arguments presented by McKinney. As a result, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2009 and 2010, McKinney had been found to be mentally ill in civil proceedings and was committed to the Osawatomie State Hospital for care and treatment. McKinney has a history of schizophrenia. He was eventually released from the hospital, although the record does not reflect the exact date of his discharge.

2

In 2018, McKinney lived with Bert McKinney, his stepbrother, and Marie McKinney, his stepmother. On August 1, 2018, McKinney had been drinking, shooting a 12-gauge shotgun outside, and coming in and out of the house while he was "ranting and raving." McKinney also had a semiautomatic pistol, which he carried in and out of the house. McKinney tried to pick a fight with Bert, who was sitting in a chair in the living room watching TV. McKinney eventually went down the hallway to his bedroom. Soon after, Bert felt something hit the side of his face and then heard a shot. A bullet had passed through Bert's sinus passageway and exited out his cheek. He survived the injury.

Jackson County Sheriff's Deputy Travis Mumma received a call from dispatch for an accidental gunshot wound to the head. Mumma proceeded to McKinney's home and saw Bert, who was leaning over to his side and holding his hand against his bloody face. Mumma asked several times where the weapon was located. McKinney eventually stated it fell on the floor and he would show Mumma where it was located. McKinney took Mumma to a bedroom and stepped inside. Mumma asked McKinney if the weapon was in the room and when McKinney said it was, Mumma told McKinney to leave the weapon where it was and come back out of the room. Mumma had everyone stay in the main room so that he could tend to Bert and still see McKinney and Marie.

Bert, who was alert and talking, told Mumma that he was sitting in the chair watching television when he felt like he had been slapped in the head, then he heard a pop and realized he had been shot. Bert told Mumma that McKinney had been going from room to room carrying a pistol. EMS transported Bert to the hospital. Law enforcement secured the house and applied for a search warrant.

That evening, Jackson County Sheriff's Detective Phil McManigal interviewed McKinney. McKinney told McManigal that he drank a bottle of wine earlier in the day. McKinney also stated, "'I can tell you that I don't know what happened . . . . The last thing I wanted was for anybody to get hurt. That is a true story.'"

3

After interviewing McKinney, McManigal went to the hospital to talk to Bert. Bert believed McKinney had schizophrenia or some other mental issue. Bert told McManigal that McKinney is supposed to be on medication, but he does not take it, and he drinks a lot. In describing the shooting, Bert said that once McKinney went in the bedroom, he felt something hit the left side of his face and heard a gun discharge. Bert said the bullet came through the wall which separates McKinney's bedroom from the living room.

Jackson County Sheriff's Detective Mark Montag received a search warrant and went to the house. He photographed and searched the house. Montag found the handgun on the dresser in McKinney's room next to two ammunition magazines. He also found a shell casing on the bed. Montag photographed a hole in the wall of the bedroom, which was the common wall with the living room. He also found a couple of wine bottles in the trash can in McKinney's room. Montag lifted fingerprints from the wine bottles, and they matched McKinney's prints. Officers found the spent bullet in the living room, and the bullet and shell casing matched the pistol found in McKinney's bedroom. Montag also investigated the height and angle of the bullet hole and found that the gun was fired at a downward angle and the bullet hole was about 41 inches off the ground.

On August 6, 2018, the State charged McKinney with one count of reckless aggravated battery. The State later filed an amended complaint also charging McKinney with criminal use of a weapon in violation of K.S.A. 2018 Supp. 21-6301(a)(13), which prohibits possession of a firearm by a mentally ill person.

The district court held a jury trial on February 19 and 20, 2019. Mumma testified about responding to the call on the day of the shooting. McManigal testified about his investigation and interviews with McKinney and Bert. Bert testified about living with McKinney and his various mental problems. Bert also testified about what happened on the day of the shooting and feeling the bullet hit him.

4

Montag explained the layout of the house through the various pictures he took. Montag testified that his officers did not touch the gun or magazines before they were photographed. He explained that even if the magazines were ejected from the gun, there still could have been a round in the gun's chamber. He also testified that the trajectory of the bullet hole excluded the gun from having been dropped on the floor and firing. Montag explained that based on the height of the bullet hole and the downward trajectory, the gun would have had to have been held higher than 41 inches off the ground when it was discharged.

The State also admitted two orders of protective custody, one dated May 22, 2009, and one dated April 29, 2010, finding McKinney to be "mentally ill as defined by law" and committing him to the Osawatomie State Hospital until further order of the court. McKinney put on no evidence. The jury found McKinney guilty as charged.

On March 8, 2019, the district court held a sentencing hearing. Based on McKinney's criminal history, the district court imposed a controlling presumptive sentence of 60 months' imprisonment with 24 months' postrelease supervision. McKinney timely appealed the district court's judgment.

SUFFICIENCY OF THE EVIDENCE

McKinney first claims there was insufficient evidence to support his conviction of aggravated battery because the State failed to prove he acted recklessly. He argues that the State failed to show that while he was alone in his bedroom, he consciously perceived a risk and disregarded it. McKinney suggests that it was possible that he was trying to clean the gun when it fired accidentally, and the State did not disprove this theory.

The State argues there was sufficient evidence to support its claim that McKinney acted recklessly because the evidence showed he was drunk, he had mental issues for

5

which he was not taking medication, he was angry, and he knew he should not be handling weapons inside the house. The State argues McKinney's firing the weapons outdoors earlier in the day shows that he realized the danger presented by firearms. The State cites cases to support its assertion that the facts here establish recklessness.

> "'When a criminal defendant challenges the sufficiency of the evidence used to support a conviction, an appellate court looks at all the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. A reviewing court "generally will 'not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" [Citations omitted.]'" *State v. Gonzalez*, 311 Kan. 281, 286, 460 P.3d 348 (2020).

A conviction can be based on circumstantial evidence if it allows the fact-finder to make reasonable inferences, and the circumstantial evidence need not exclude every other reasonable conclusion to be sufficient to support a conviction. *State v. Banks*, 306 Kan. 854, 858-59, 397 P.3d 1195 (2017). "A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom." *State v. Rizal*, 310 Kan. 199, 209-10, 445 P.3d 734 (2019).

McKinney was convicted of aggravated battery which is defined as "recklessly causing great bodily harm to another person or disfigurement of another person." K.S.A. 2020 Supp. 21-5413(b)(2)(A). "A person acts 'recklessly' . . . when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2020 Supp. 21-5202(j). McKinney does not argue that the facts here do not support a finding that there was a gross deviation from the standard of care. Instead, he only argues that the State failed to establish that he consciously disregarded a substantial risk.

6

The State points to several Kansas cases to support its assertion that there was sufficient evidence presented to support finding McKinney consciously disregarded a substantial risk. Of the cases cited, two are particularly helpful as they involve what the defendant claimed was an accidental discharge of a firearm. In *State v. Gonzalez*, 307 Kan. 575, 412 P.3d 968 (2018), the defendant was convicted of reckless second-degree murder after a gun in his possession discharged while he was driving his car, killing a passenger. The defendant claimed the shooting was accidental and blamed the trigger safety for not working properly. Our Supreme Court found the evidence was sufficient to support his conviction in part because the defendant chose to handle the gun when he was very drunk, he had been out shooting earlier in the day and was experienced with guns, he had casually pointed the loaded gun at two other people, and the victim's injury revealed the gun was against his neck when it was discharged. 307 Kan. at 587.

Similarly, in *State v. Franklin*, No. 120,378, 2020 WL 593818 (Kan. App. 2020) (unpublished opinion), *rev. denied* 312 Kan. __ (September 30, 2020), this court found the defendant recklessly killed the victim when he drank and smoked marijuana, gave the gun to a friend for safe keeping at the beginning of the night, casually pointed the loaded weapon at another person, removed the magazine when requested, and had the gun in his hand after it discharged. 2020 WL 593818, at *2-3. Franklin, like McKinney, argued that being impaired was not enough to support a finding that he acted recklessly. This court agreed but pointed out that the evidence in the case also showed that he knew the danger the gun posed, since he asked someone else to keep it and removed the ammunition, yet he disregarded that risk when he continued to point the gun at people. 2020 WL 593818, at *3-4. This court acknowledged that there was no direct evidence of Franklin's actions at the moment the gun was fired, but it found that there was enough circumstantial evidence to establish that the Franklin acted recklessly. 2020 WL 593818, at *4.

Here, the evidence showed:  (1) earlier in the day McKinney was outside shooting; (2) McKinney was walking in and out of the house with the handgun; (3) McKinney had

7

argued with Bert and knew he was sitting in the chair near the common wall when he walked to his bedroom; (4) McKinney drank at least one bottle of wine shortly before the incident; (5) McKinney was "ranting and raving" and agitated; (6) McKinney had some mental issues and was supposed to be on medications that he did not take; (7) the bullet hole's height and slight downward trajectory excluded the gun from having been dropped on the ground and firing; (8) two magazines were found next to the gun; and (9) even if the magazines were ejected, there still could have been a round in the gun's chamber.

When the evidence is viewed in a light most favorable to the State, there is sufficient circumstantial evidence to establish that McKinney consciously disregarded a substantial risk. Much like in *Gonzalez* and *Franklin*, the jury here could infer that McKinney understood the danger posed by guns because he previously chose to shoot the guns outside instead of inside the house. The evidence also shows that even though McKinney knew the danger, he chose to handle the gun after consuming at least one bottle of wine, while angry or agitated, and while not on medications that he was supposed to take for his mental health issues. Based on the bullet hole and Montag's testimony about its trajectory, the jury could infer McKinney chose to point the gun at the common wall knowing Bert was sitting on the other side.

Granted, the evidence does not foreclose the possibility of an accidental and innocent shooting with no reckless conduct. As in *Franklin*, there was no direct evidence of McKinney's actions at the moment the gun was fired. But given our standard of review, there was sufficient evidence to support McKinney's reckless aggravated battery conviction. Although the evidence is circumstantial, when it is viewed in a light most favorable to the State the jury could reasonably infer that McKinney acted recklessly and consciously disregarded a substantial risk when he brought a loaded gun into the house, he was agitated and angry, he was drinking and off his medication, and he pointed the gun at the common wall with Bert on the other side.

## DOES K.S.A. 2020 SUPP. 21-6301(a)(13) VIOLATE THE SECOND AMENDMENT?

McKinney next claims that his conviction for criminal use of a firearm should be reversed because the statute, K.S.A. 2020 Supp. 21-6301(a)(13), is unconstitutional under the Second Amendment to the United States Constitution. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The State asserts that the statute does not violate the Second Amendment.

McKinney concedes that he did not raise a Second Amendment challenge before the district court. Generally, this court does not hear constitutional issues that were not raised before the district court. *State v. Johnson*, 309 Kan. 992, 995, 431 P.3d 1036 (2019). But there are exceptions, including when "the newly asserted theory involves 'only a question of law arising on proved or admitted facts and the issue is finally determinative of the case'" or when "'resolution of the question is necessary to serve the ends of justice or to prevent denial of fundamental rights.'" 309 Kan. at 995.

McKinney asserts that this court can hear the issue because it is necessary to prevent the denial of a fundamental right and it is a question of law that is determinative of the case. He does not explain how this is a pure question of law but does correctly assert that the right to bear arms is a fundamental right applicable to the states through the Fourteenth Amendment. See *McDonald v. City of Chicago*, 561 U.S. 742, 778, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) ("it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty"). We will address McKinney's claim under this exception.

9

A statute's constitutionality is a question of law subject to unlimited review. *Gonzalez*, 307 Kan. at 579. As for interpreting constitutional provisions, the Kansas Supreme Court has stated:

> "'[T]he best and only safe rule for ascertaining the intention of the makers of any written law, is to abide by the language they have used; and this is especially true of written constitutions, for in preparing such instruments it is but reasonable to presume that every word has been carefully weighed, and that none are inserted, and none omitted without a design for doing so.' [Citation omitted.]" *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 622-23, 440 P.3d 461 (2019).

K.S.A. 2020 Supp. 21-6301(a)(13) states in part: "Criminal use of weapons is knowingly: . . . possessing any firearm by a person who is or has been a mentally ill person subject to involuntary commitment for care and treatment, as defined in K.S.A. 59-2946, and amendments thereto." The Kansas Legislature enacted this statute in 2010.

McKinney's argument that the statute violates the Second Amendment is narrow. He emphasizes the phrase "has been a mentally ill person" and asserts that the statute unconstitutionally "functions as a lifetime ban on the possession of a firearm for all persons who at any time in their lives have been declared a mentally ill person . . . regardless of whether they remain such a person." McKinney then briefly cites federal caselaw that he claims supports his assertion that a lifetime ban on the possession of a firearm is not justified and that such laws require the application of strict scrutiny. McKinney concludes by stating K.S.A. 2020 Supp. 21-6301(a)(13) cannot survive strict scrutiny because it has no time limitation "or a procedural means for review."

But even assuming, without deciding, McKinney is correct that a lifetime ban on the possession of a firearm is unconstitutional, he has no right to relief. As the State correctly points out, McKinney's entire argument stems from a faulty premise—that there is no procedure to restore a previously mentally ill person's right to possess a weapon.

10

The criminal use of a weapon statute contains a provision that explicitly states that K.S.A. 2020 Supp. 21-6301(a)(13) "shall not apply to a person who has received a certificate of restoration pursuant to K.S.A. 75-7c26, and amendments thereto." K.S.A. 2020 Supp. 21-6301(k). K.S.A. 75-7c26(a) provides that a person who is discharged from care and commitment may petition for restoration. Upon petition, the court issues a certificate of restoration "[i]f the court finds the person is no longer likely to cause harm to such person's self or others, . . . [s]*uch restoration shall have the effect of restoring the person's ability to legally possess a firearm*, and the certification of restoration shall so state." (Emphasis added.) K.S.A. 75-7c26(c).

Thus, contrary to McKinney's assertion, there is a procedure for a person to seek review of their classification as a mentally ill person prohibited from possessing a firearm under K.S.A. 2020 Supp. 21-6301(a)(13) and the statute does not operate as a lifetime ban. Limiting our analysis to the argument McKinney makes on appeal, we reject his claim that the statute violates the Second Amendment.

DOES K.S.A. 2020 SUPP. 21-6301(a)(13) VIOLATE THE KANSAS CONSTITUTION?

McKinney next claims that K.S.A. 2020 Supp. 21-6301(a)(13) is facially unconstitutional because it violates the plain language of section 4 of the Kansas Constitution Bill of Rights. Section 4 states, in relevant part:  "A person has the right to keep and bear arms for the defense of self, family, home and state, for lawful hunting and recreational use, and for any other lawful purpose." Kan. Const. Bill of Rights, § 4 (2020 Supp.).

As in his previous issue, McKinney concedes that he did not challenge the constitutionality of the statute below, but he again argues that he can raise it because it is a question of law arising on proved facts that is determinative of the case and review is necessary to prevent the denial of a fundamental right. The State disagrees that this issue

11

presents only a question of law on proved facts, but it does not challenge McKinney's assertion that review is necessary to prevent the denial of a fundamental right. Once again, we will address McKinney's claim to prevent the denial of a fundamental right.

McKinney advances two arguments to support his assertion that K.S.A. 2020 Supp. 21-6301(a)(13) violates section 4: (1) Section 4 provides broader protection than the Second Amendment and (2) section 4's plain language prohibits any restriction on the possession of a firearm. To evaluate his arguments, we must interpret constitutional provisions, which is subject to de novo review. *Gonzalez*, 307 Kan. at 579.

*McKinney provides no persuasive argument or authority to support interpreting section 4 differently than the Second Amendment to the United States Constitution.*

McKinney argues that section 4, which was amended in 2010, contains "obvious differences" from the language of the Second Amendment to the United States Constitution and should thus be interpreted differently. The State argues the provisions should be interpreted similarly and points out that a prohibition on the mentally ill possessing firearms is permissible under the federal right.

We will again quote each constitutional provision, to compare the text. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Section 4 states in relevant part: "A person has the right to keep and bear arms for the defense of self, family, home and state, for lawful hunting and recreational use, and for any other lawful purpose." Kan. Const. Bill of Rights, § 4 (2020 Supp.).

The only "difference" McKinney points to in support of his assertion that the two provisions should be interpreted differently is that section 4 guarantees every "person" an

12

individual right to bear arms while the Second Amendment grants the right to "the people." He points out that before 2010, section 4 provided in relevant part that "[t]he people have the right to bear arms for their defense and security." But the 2010 amendment to section 4 deleted the word "people" and changed the operative language to provide that every "person" has the right to keep and bear arms. McKinney argues that the difference in language unequivocally grants every Kansas "person" the "individual right" to bear arms, as opposed to the federal grant to the "people."

We reject McKinney's claim that section 4 should be interpreted differently than the Second Amendment under the argument he presents on appeal. The general rule in Kansas is that the Kansas Constitution is interpreted similarly to its federal counterpart even though the language may differ. See *State v. Lawson*, 296 Kan. 1084, 1091, 297 P.3d 1164 (2013) ("But, at least for the past half-century, this court has generally adopted the United States Supreme Court's interpretation of corresponding federal constitutional provisions as the meaning of the Kansas Constitution, notwithstanding any textual, historical, or jurisprudential differences."). And even though the Second Amendment uses the word "people," the United States Supreme Court has stated: "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an *individual right* to keep and bear arms." (Emphasis added.) *District of Columbia v. Heller*, 554 U.S. 570, 595, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). Thus, both provisions, despite a difference in language, confer an individual right to bear arms. U.S. Const. amend. II; Kan. Const. Bill of Rights, § 4 (2020 Supp.).

Further, while section 4 contains other language that the Second Amendment does not—"for the defense of self, family, home and state, for lawful hunting and recreational use, and for any other lawful purpose"—this language merely enumerates or provides examples of the protections inherently conferred by the Second Amendment. If anything, the Second Amendment provides greater protection than section 4 provides because it states that the individual right to bear arms "shall not be infringed."

13

In *Heller*, the United States Supreme Court examined the Second Amendment in depth. The Court explained that the Second Amendment was not a novel principle, but a codification of rights grounded in history. 554 U.S. at 599. In examining that history, the Court mentioned that Americans valued the right to bear arms for both self-defense and hunting purposes. 554 U.S. at 599. The Court also mentioned that in prior precedent it described the right as """bearing arms for a lawful purpose""" and stating that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 620, 625.

Based on this history, *Heller* ultimately found a law prohibiting the possession of a handgun in the home unconstitutional, explaining "the inherent right of self-defense has been central to the Second Amendment right" and the law impermissibly prohibited the "defense of self, family, and property." 554 U.S. at 628-29. This analysis establishes that the protections explicitly enumerated by section 4—defense of self, family, home and state, for lawful hunting and recreational use, and for any other lawful purpose—are equivalent to those protected by the Second Amendment. Thus, even though the two provisions use different language, the substantive protections that each provision confers are similar.

In sum, McKinney provides no persuasive authority or argument to support his contention that section 4 should be interpreted differently than the Second Amendment. The two provisions provide similar protections despite any difference in language. Thus, section 4 should be interpreted as coextensive to the Second Amendment. And as discussed, the protections guaranteed under the Second Amendment are not unlimited. See *Heller*, 554 U.S. at 595. A prohibition on possession of firearms for the mentally ill is permissible. See 554 U.S. at 626 (stating that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill"). Although we could end our analysis here, we will briefly take up

14

McKinney's assertion that section 4's plain language prohibits any restriction on the possession of a firearm.

*Even if we were to address section 4 independently from the Second Amendment, McKinney has failed to adequately brief his assertion that section 4 prohibits any restriction on the possession of a firearm.*

McKinney argues that the plain language of section 4 independently provides an absolute right to possess firearms. He asserts section 4 only allows the Legislature to limit the unlawful use of a firearm. Thus, McKinney argues that because K.S.A. 2020 Supp. 21-6301(a)(13) criminalizes the mere possession of a firearm and it provides no exception allowing the mentally ill to possesses a firearm for the lawful purposes protected by section 4, it is unconstitutional. McKinney asserts that "no level of infringement of section 4 is acceptable under these circumstances."

McKinney asserts that to address his claim this court should adopt the "four-part test" used by the Kansas Supreme Court in *Hodes & Nauser*, which he states requires this court to determine (1) "whether a fundamental right is at issue"; (2) "that the government has infringed upon that right"; (3) "if infringement is present, it must be determined whether infringement of that right is acceptable at all"; and (4) "if some infringement is permissible, the government must pass the strict scrutiny test when a fundamental right is implicated." 309 Kan. at 660-63.

But what McKinney cites is not a test but part of the analytical path the Kansas Supreme Court took in *Hodes & Nauser* to address whether section 1 of the Kansas Constitution Bill of Rights protects a woman's decision on whether to continue a pregnancy. 309 Kan. at 624. The Kansas Supreme Court summarized that the appellees had to (1) "establish this right exists and that our Constitution protects it" and (2) that the challenged statute "unconstitutionally infringes on this right." 309 Kan. at 619-20. In addressing whether an alleged constitutional right exists, our Supreme Court engaged in

15

lengthy and detailed analysis to determine the scope of protections offered under section 1, which included examining the historical record. 309 Kan. at 627-60. In addressing whether the challenged statute infringed on that right, the court acknowledged that the historical record showed that the right did not prohibit all government encroachment and then determined what type of scrutiny applied to this right. 309 Kan. at 661-64.

Although McKinney cites *Hodes & Nauser* and seems to recognize the court's extensive analysis, he fails to adequately brief his claim that section 4 provides an absolute right to possess firearms. His argument on the scope and meaning of section 4 is conclusory. After quoting section 4's language, he concludes that "[b]ased on [the language], at all times a person may possess a firearm for defense purposes, regardless of anything that happened in that person's past." But as the court stated in *Hodes & Nauser*, McKinney must first "establish this right exists and that our Constitution protects it." 309 Kan. at 620.

McKinney's argument hinges on the language of section 4 to assert that it provides an absolute right to possess firearms for one of the stated purposes, such as self-defense. But the scope of protection provided by a right is not always absolute despite its language. See, e.g., *Hodes & Nauser*, 309 Kan. at 661-62 (stating debates about the wording of section 1 shows it does not prohibit all government encroachment on the right to an abortion); *State v. Love*, 305 Kan. 716, 735, 387 P.3d 820 (2017) (noting section 5's jury trial right applies only to issues of fact tried by a jury at common law); *State v. Russell*, 227 Kan. 897, 899-900, 610 P.2d 1122 (1980) (stating section 11's freedom of speech is not without limitation and giving the example that no person has a right to cry fire in a crowded theater).

Thus, an enumerated right's language does not necessarily address the scope of protection conferred by the right. For instance, although a person has a right to possesses a firearm for self-defense, section 4's language does not state that a person is then entitled

16

to possess and carry that firearm at all places and at all times. Conceivably there could be places or times or even people—felons or the mentally ill—who are outside the scope of protection offered by section 4. Likewise, the plain language of section 4 does not tell us what types of firearms a private citizen has a constitutionally protected individual right to possess, such as handguns or hunting rifles versus military-style assault weapons.

"When the words themselves do not make the drafters' intent clear, courts look to the historical record, remembering '"the polestar . . . is the intention of the makers and adopters."'" *Hodes & Nauser*, 309 Kan. at 623. Thus, we would need to look beyond the plain language of section 4 to define the scope of its protections. But McKinney provides almost no analysis to explain the drafters' intent or to discuss the scope of section 4 outside its plain language. He cites *City of Salina v. Blaksley*, 72 Kan. 230, 231, 83 P. 619 (1905), for the proposition that over a century ago our Supreme Court found that the original language of section 4 did not convey an individual right to bear arms to the citizens of Kansas. He then states, without offering any more analysis or citing any authority, that "[t]o overrule that precedent, the people of Kansas amended section 4 to the current version in 2010." Without more relevant analysis, we deem McKinney's argument that section 4 prohibits any restriction on the possession of a firearm to be inadequately briefed and abandoned. See *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015) ("When a litigant fails to adequately brief an issue it is deemed abandoned.").

In sum, we hold that section 4 of the Kansas Constitution Bill of Rights should be interpreted as coextensive to the Second Amendment. As a result, McKinney's argument that K.S.A. 2020 Supp. 21-6301(a)(13) violates section 4 fails because the United States Supreme Court has accepted bans on possession of firearms for the mentally ill. But even if we were to address section 4 independently from the Second Amendment, then we decline to opine on the scope of section 4 because McKinney provides almost no authority, argument, or historical support for his conclusory assertion that section 4 as amended in 2010 provides an absolute right to possess a firearm. The scope of section 4

17

since its amendment in 2010 is an issue of first impression in Kansas. Because the language of section 4 does not make the drafters' intention clear, we would need to look to the historical record to resolve this issue. But McKinney fails to adequately engage in such analysis here.

Affirmed.