IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,378

STATE OF KANSAS,
*Appellee*,

v.

JULIO ROMERO FRAIRE,
*Appellant*.

SYLLABUS BY THE COURT

1.

When evaluating a motion for mistrial under K.S.A. 22-3423(1)(c), the trial court decides whether the prejudicial conduct created a fundamental failure in the proceeding. If it did, the district court next decides whether the prejudicial conduct made it impossible to continue the proceeding without denying the parties a fair trial. Under the second step, the court considers whether the conduct caused prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice.

2.

A prosecutor may comment on the strength of the State's case if the prosecutor informs the jury that he or she believes the evidence suffices to prove the elements of a crime and the prosecutor makes the statement merely directional, and not an expression of personal opinion.

3.

A defendant may waive the right to challenge the trial court's response to a jury request by failing to object.

1

4.

When trial counsel affirmatively approves of a court's response to a jury's question, an assertion on appeal of error in the response is tantamount to invited error, rendering the issue unreviewable.

5.     A sentencing court has no authority to order a term of postrelease supervision in conjunction with an off-grid indeterminate life sentence.

Appeal from Ford District Court; E. LEIGH HOOD, judge. Opinion filed February 19, 2021. Affirmed in part and vacated in part.

*Peter Maharry,* of Kansas Appellate Defender Office, argued the cause, and was on the brief for appellant.

*Jodi E. Litfin*, assistant solicitor general, argued the cause, and *Derek Schmidt,* attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Julio Fraire appeals from his convictions of premeditated first-degree murder and criminal possession of a weapon by a convicted felon. He also appeals from the imposition of lifetime postrelease supervision as part of his sentence. We affirm his convictions and vacate his sentence of postrelease supervision.

## FACTS

Late in the evening of July 24, 2015, a couple of small groups of people were assembled in the lower level of a parking garage outside the Hennessy nightclub in

Dodge City, where a concert was taking place. A group of four men were standing together when another man with a braided ponytail, who was later identified as Ramiro Nicholas Bernal, approached them. A fistfight between Bernal and a member of the group ensued. A man, whom the prosecution would later contend was Fraire, approached the two combatants and began firing at Bernal. He fired several shots from a short distance and then, when Bernal fell to the ground, stood over him and fired additional shots.

Three women who were standing nearby observed the scene, got in their car, and drove away from the parking garage. They soon encountered a police patrol car and signaled for it to stop. They informed the police officer a shooting took place outside the Hennessy, and they then returned to the club. The officer radioed in the reported shooting and drove to the garage.

Other officers quickly responded, and, within minutes, they found the shooting victim crouched over on the ground saying he was having trouble breathing. From his driver's license, police identified him as Bernal. An ambulance took him to a nearby hospital, where he died at around 1:00 a.m. on July 25. He never identified his shooter. He had taken six shots to his body and died from the wounds. Police found six shell casings scattered around the garage, and, in the morning, the gun that fired the shots was found in a nearby street gutter.

The police interviewed the three women who had witnessed and reported the shooting. One of the women, Astoshia Budd, told them she thought she recognized the shooter and identified him as Rigoberto Diaz based on his eyes and the presence of neck tattoos. A second woman told police the shooter was "Mexican or white" and he wore

3

some kind of cap. The third woman agreed with Budd in observing that the shooter was Hispanic and was not the same man involved in the fight with Bernal.

Surveillance cameras recorded groups of people walking to and from the parking garage. Based on the video evidence and witness statements, the group of four men was eventually identified as Joe David "J.D." Gonzalez, Miguel Aguilera, Mario Ortuno, and Julio "Locs" Fraire. Gonzalez and Aguilera identified themselves in the surveillance video.

Putting together witness statements and the surveillance evidence, the State charged Fraire with one count of premeditated first-degree murder and one count of criminal possession of a firearm by a convicted felon. Before his trial, several individuals contacted police and offered to testify against Fraire in exchange for reduction in charges and sentences. These potential witnesses were Gonzalez and Aguilera, who were also facing charges in the case, and Saul Ramirez, who became acquainted with Fraire in jail.

At Fraire's trial, Gonzalez and Aguilera testified they lied during initial police interviews, when they denied participating in the shooting or knowing who fired the shots. Aguilera testified he was the individual who got into the fistfight with Bernal. Gonzalez testified that Fraire took a gun and shot Bernal. Aguilera testified he never heard any shots and never saw Bernal get shot, but when he looked up at Fraire, he had the gun in his hand, and Fraire later told him he had shot Bernal.

Saul Ramirez testified at trial that, while he was in jail in February of 2016, Fraire told him that "he shot Sleepy." "Sleepy" was a street name for Bernal. Fraire told Ramirez that he shot Sleepy more than once. Ramirez testified that some 54 charges pending against him in Liberal were dismissed in exchange for his testimony.

4

The jury convicted Fraire of both premeditated first-degree murder and criminal possession of a weapon by a convicted felon. The court sentenced Fraire to a hard 50 life sentence for the murder and an additional 21 months in prison for the criminal possession of weapon conviction. He took a timely appeal to this court.

## DISCUSSION

*Clothes Worn by a Witness*

A witness for the State testified while wearing clothing similar to clothing Fraire wore on a previous day of the trial. After the witness finished testifying, Fraire moved for a new trial, asserting that the similarity in clothing confused the jury and prejudicially undermined his argument that someone else committed the crime. The trial court denied the motion. Fraire argues his right to a fair trial was prejudiced by the apparel worn by him and the witness.

A trial court's decision denying a motion for mistrial is reviewed under an abuse of discretion standard. This court engages in a two-step analysis of the abuse of discretion standard. First, did the trial court abuse its discretion when deciding whether there was a fundamental failure in the proceeding? If so, then did the trial court abuse its discretion when deciding whether the conduct caused prejudice that could not be cured or mitigated through admonition or jury instruction, resulting in an injustice? *State v. Miller*, 308 Kan. 1119, 1162, 427 P.3d 907 (2018).

Budd informed police after the shooting that she thought Diaz was the shooter. She agreed that she had told police she was "100 percent certain" that Diaz was the man she saw firing a weapon. Diaz turned himself in to the police when he heard he was

5

wanted as a suspect. He told the police, and later testified at the trial, that he was nowhere near the scene of the shooting and he had an alibi. He was never charged in connection with the crime.

On the first day of the jury trial, Fraire appeared wearing an outfit provided by the jail. The outfit consisted of a striped shirt and blue jeans. On the fourth day of the trial, Diaz testified for the State. He was wearing the same, or a very similar, striped shirt and blue jeans. Fraire noticed the similarity in clothing and pointed it out to his attorney. The similarity in clothing was not mentioned by the parties in direct or cross-examination and was not pointed out to the jury.

Fraire's attorney moved for a mistrial. He argued to the court that the similarity in clothing could lead the jury to conclude that Diaz and Fraire looked alike and that the witness who originally identified Diaz as the shooter had simply confused their identities:

> "I do have concerns, Judge, about the subliminal suggestion that it plays to the jury in the ease with which the government can then argue, well, clearly there is a reason why Astoshia Budd was mistaken that night, look how similar these people look, which is why I raised the concern and the issue."

K.S.A. 22-3423(1)(c) provides that the trial court may terminate the trial and order a mistrial at any time the court finds termination necessary because "[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution."

When evaluating a motion for mistrial under this provision, the district court decides whether the prejudicial conduct created a fundamental failure in the proceeding.

6

If it did, the district court next decides whether the prejudicial conduct made it impossible to continue the proceeding without denying the parties a fair trial.

Under the second step, the court considers whether the conduct caused prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice. *State v. Moore*, 302 Kan. 685, 693, 357 P.3d 275 (2015). Here, the trial judge made several determinations when he denied the motion for a new trial. He noted that neither attorney nor the court made any mention to the jury about the clothes being similar or identical. He next noted that he himself had not noticed the similarity in clothing and stated "[t]here was nothing in and of itself distinctive that would draw one's attention" to the clothing. Furthermore, he found no evidence suggesting the choice of outfits was intentional by the prosecution, the detention facility, or the court bailiffs.

Fraire pursues this issue on appeal. His argument runs something like this: The State sought to discredit Budd's testimony by giving the jury a reason to write her off as a witness who injected reasonable doubt into the case. How could the jury be sure of Fraire's guilt beyond a reasonable doubt when a witness said she saw someone else do it? By clothing Diaz in a way that might tend to make him look more like Fraire, the State was subliminally suggesting he looked like the defendant, which was why the witness thought she saw someone else—it was because that other individual looked so much like the defendant.

This argument is tenuous and unsupported by any evidence in the record that anyone other than Fraire himself noticed the similarity in clothing. Budd testified that she identified Diaz based on tattoos on his neck and his eyes. Her identification made no reference to his clothing, and she did not testify that Diaz and Fraire were similar in appearance. The "subliminal" prejudice against his case does not rise to the level of

7

showing a probability that any error here affected "the outcome of the trial in light of the entire record." See *State v. Logsdon*, 304 Kan. 3, 39, 371 P.3d 836 (2016).

This is not the kind of situation presented in cases alleging prejudice because defendants or witnesses appeared at trial dressed in obvious prison attire, a "guilt by sartorial association" that might lead juries to condemn or discount individuals because of their incarcerated status. See *State v. Ward*, 292 Kan. 541, 583, 256 P.3d 801 (2011) (Rosen, J., dissenting). As the State has suggested, it is equally possible that, if the clothing produced any prejudicial effect, it was to Fraire's benefit. Budd testified that she was certain that the man she saw shoot Bernal was Diaz, and the fact that the two looked similar at trial could bolster the notion that Budd was correct and Aguilera and Gonzalez, who both had credibility problems and benefitted from testifying against Fraire, were incorrect in their identification of Fraire as the shooter. Confusion about the defendant looking like other people would seem to help the defendant's case that it was not he who was seen firing the gun.

In sum, Fraire fails to demonstrate the existence of any prejudice, let alone prejudice sufficient to demonstrate the trial court abused its discretion in denying his motion for a mistrial.

*Opening Statement Prosecutorial Error*

Fraire complains that, during opening statement, the prosecutor told the jury that this is not a perfect world and that the State's case was also not perfect but that the State's evidence would suffice to prove Fraire's guilt beyond a reasonable doubt. Fraire contends the prosecutor thereby interjected his personal opinion into his opening statement.

8

This court reviews a claim of prosecutorial error under a two-step analysis. First, the court decides whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. Then, if the court finds error, it next determines whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, the court adopts the traditional constitutional harmlessness inquiry—prosecutorial error is harmless if the State can demonstrate beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record, which is to say, there is no reasonable possibility that the error contributed to the verdict. *State v. Ross*, 310 Kan. 216, 220-21, 445 P.3d 726 (2019).

During opening statement, the prosecutor summarized the evidence the State would present to prove its case. This recital of anticipated evidence covers 12 pages of transcript. The prosecutor then made the following comments:

> "[W]hen considered as a whole, there is little room for doubt who the shooter was, who it was that killed Ramiro Bernal. It's the Defendant in this case.
>
> "This is not a perfect world, and this is not a perfect case. In a perfect world, we would expect irrefutable forensic evidence, like D.N.A. or fingerprints that would link a specific person conclusively to a crime. There will not be any of that in this case.
>
> "In a perfect world, witnesses to a crime would be able to recall the exact sequence of events and details of an event months or years after it happened.
>
> "And, although the three girls, Astoshia, . . . and . . . , each of them gave one or more statements, there are differences between some of those statements. One of the girls

9

even believed she knows who the shooter is. And, that lead is followed up on and dismissed.

"In a perfect world, those who are with a criminal at the time a crime is committed and who assisted in committing that crime would have a moment of clarity, a moment of moral certainty where they decide to come clean and not ask for anything in return.

"Both J.D. and Miguel, of course, as mentioned, received favorable treatment in exchange for their statements.

"This may not be a perfect case, but it is a good case. And, at the close of the evidence in this case, after you are instructed in the law by the Court and the case is turned over to you for deliberation, you will find that law enforcement did a thorough job investigating this case, and that the fruits of that investigation leave no doubt as to who it was that killed Ramiro Bernal in the midnight hours between July 24 and July 25th, 2015."

It is well established that a prosecutor may not express an opinion regarding the credibility of a witness. See, e.g., *State v. Akins*, 298 Kan. 592, 607, 315 P.3d 868 (2014). Furthermore, a prosecutor may not argue facts not in evidence. See, e.g., *Akins*, 298 Kan. at 605.

It is not necessarily the case, however, that a prosecutor may not comment on the strength of the State's case. In *State v. Peppers*, 294 Kan. 377, 399-400, 276 P.3d 148 (2012), this court discussed the kind of commentary allowed when a prosecutor informs the jury that he or she believes the evidence suffices to prove the elements of a crime:  "It is necessary . . . for a prosecutor to say something

10

akin to 'the evidence shows defendant's guilt' in order to make a statement merely directional and not an expression of the prosecutor's personal opinion."

Relying on *Peppers*, the court in *State v. Mireles*, 297 Kan. 339, 368, 301 P.3d 677 (2013), held that it was not error for the prosecutor to comment on the strength of the evidence supporting lesser included offenses. The court concluded: "The comment at issue was within the wide latitude a prosecutor is allowed in discussing the evidence; thus, the comment did not constitute prosecutorial misconduct." 297 Kan. at 369.

Here, the prosecutor averred that the State's case was not perfect. While this may have been an opinion, it was not one that favored the State. It was followed by a recital of prospective evidence that demonstrated imperfections in the case. The commentary did not present statements that were ungrounded in the facts, and it did not create prejudice against Fraire.

The prosecutor then stated that the State's case was good and that the jury would find that the evidence sufficed to support a conviction. It is to this particular statement that Fraire objects. In isolation, the comment that "it is a good case" smacks of personal opinion. But this comment did not occur in isolation; it followed an extensive recital of the evidence the State would produce, and it followed a recital of the weaknesses in the State's case. This satisfied this court's requirement that the prosecutor "say something akin to 'the evidence shows defendant's guilt.'" See *Peppers*, 294 Kan. at 400.

The prosecutor's comments did not constitute error.

11

*Jury Transcript Request*

After it began deliberations, the jury sent two requests to the court, one for a list of the witnesses and one for the transcript of testimony. The court granted the first request but denied the second, and Fraire asserts the court committed reversible error when it denied the blanket request without seeking further information from the jury. K.S.A. 2020 Supp. 22-3420(d) places a mandatory duty upon the trial court to respond to a jury's request for further information. See *State v. Boyd*, 257 Kan. 82, 87, 891 P.2d 358 (1995) (discussing earlier version of statute). The manner and extent of the trial court's response rest in the sound discretion of the trial court. 257 Kan. at 87.

This court subjects claims of error in responding to jury requests using a two-step analysis. First, it conducts a de novo review to determine if the district court either failed to respond or provided an erroneous response to the jury's question. Second, if the district court responded to the jury's request, this court reviews the sufficiency or propriety of the response for abuse of discretion. *State v. Walker*, 308 Kan. 409, 423, 421 P.3d 700 (2018).

About half an hour after the jury went into deliberations, it submitted two questions to the court. The court discussed the questions with counsel for both parties:

> "THE COURT: . . . The Court's been presented with two questions. Before going on the record, I allowed counsel to see the two questions.
>
> . . . .

12

"THE COURT: All right. The second question is: 'May the jury have the transcript of testimony?'

"My response would be no, you should rely on your collective memories.

"MR. SALZMAN [Prosecutor]: I believe that's appropriate, Your Honor.

"MR. ARIAGNO [Defense Counsel]: That's probably the appropriate response.

"THE COURT: All right. So, what I've done is on the sheet that they listed the answer, I went down number one, and put yes. Number two, no, you should rely on your collective memories."

Not only did Fraire's counsel not object to the court's answer to the question about the transcript, he told the court he thought the answer was appropriate.

This court has recognized the necessity of preserving issues relating to a trial court's response to a request from a jury. "A defendant may waive the right to challenge the trial court's response to a jury request by failing to object." *State v. Smith*, 258 Kan. 321, 327, 904 P.2d 999 (1995). In *Boyd*, the court explained this rule:

"The time-honored rule that an issue not presented to the trial court may not be raised for the first time on appeal also applies to jury requests under K.S.A. 22-3420(3). As the State points out, a timely objection is necessary to give the trial court the opportunity to correct any alleged trial errors. Clearly, the defendant had the opportunity to object and to inform the trial court of his dissatisfaction with the ruling while the court still had a chance to correct any error. By failing to object, the defendant waived his right to raise the issue on appeal. [Citations omitted.]" *Boyd*, 257 Kan. at 89.

13

Furthermore, this court has rejected arguments that lack of preservation should be excused when an appellant presents an issue involving fundamental rights. See *State v. Race*, 293 Kan. 69, 78, 259 P.3d 707 (2011) (favorably citing *Boyd*, 257 Kan. at 89); *State v. Johnson*, 286 Kan. 824, 840, 190 P.3d 207 (2008) (favorably citing *Boyd*, 257 Kan. at 89).

In this case, not only did Fraire's counsel fail to object, he affirmatively approved of the court's response to the jury's question. This takes on some of the sense of invited error—counsel stated the trial court was doing the right thing, only to set up an issue of asserted prejudice on appeal. In *State v. Smith*, 258 Kan. 321, 327, 904 P.2d 999 (1995), this court noted that, when the trial court went along with defense counsel's response that the jury rely on its collective memory, the issue was unreviewable on appeal because any legal impropriety was "tantamount to invited error." Likewise, in *State v. Bruce*, 255 Kan. 388, 397, 874 P.2d 1165 (1994), we held: "A defendant is not permitted to join in a request for specific language to be used in answering a jury's question and then, on appeal, claim that the trial court erred in using that language."

Fraire failed to preserve this issue for appeal, and we will not engage in a discussion of speculative error.

*The Verdict Form*

In discussions about jury instructions, Fraire's counsel objected off the record to placing the "guilty" option before the "not guilty" option. On the record, the trial court denied his objection. Fraire argues on appeal that the order of the

14

options on the verdict form undermined his right to a presumption of innocence and denied him a fair trial.

In *Unruh v. Purina Mills, LLC*, 289 Kan. 1185, 1197-98, 221 P.3d 1130 (2009), this court held that, "[w]hile a verdict form is not technically a jury instruction, it is part of the packet sent with the jury which includes the instructions and assists the jury in reaching its verdict. It is appropriate to apply the same standard of review applicable to the review of instructions."

We therefore consider whether the instructions were legally and factually appropriate, using an unlimited standard of review of the entire record. The court views the evidence in the light most favorable to the defendant. Because Fraire objected to the order of the verdict form, this court will reverse only if it determines there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. *State v. Keyes*, 312 Kan. 103, 107, 472 P.3d 78 (2020).

This court has addressed this very issue on previous occasions. In *State v. Wesson*, 247 Kan. 639, 652, 802 P.2d 574 (1990), *cert. denied* 501 U.S. 1236 (1991), the court considered an argument that a verdict form violated the defendant's presumption of innocence because, for each of the crimes charged, the "guilty" blank preceded the "not guilty" blank. The court held:

> "A defendant is presumed innocent and the jury is so instructed. The purpose of a trial is to determine if the accused is guilty. We see no prejudice to the accused and, in any event, instruction 16 would cure any possibility of error. Instruction 16 reads, in pertinent part:

15

'The State has the burden of proving the defendant is guilty. The defendant is not required to prove he is not guilty. You must assume the defendant is not guilty unless the evidence convinces you of the defendant's guilt.'" 247 Kan. at 652.

We reaffirmed this holding in *State v. Wilkerson*, 278 Kan. 147, 159, 91 P.3d 1181 (2004).

Fraire argues that *Wesson* and *Wilkerson* were incorrectly decided. He contends the *Wesson* court was wrong when it stated that the purpose of a trial is to determine whether a defendant is guilty. He points to *Duncan v. State of La.*, 391 U.S. 145, 155, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968), where the court stated that criminal defendants have the constitutional right to a jury trial "in order to prevent oppression by the Government."

While the purpose of a jury trial in different contexts may be debated, Fraire makes no showing at all that the order in which the verdict form presents the options has any bearing on the likelihood of a jury reaching one verdict or the other. Realistically, jurors are probably not closely examining the verdict form before they begin their deliberations, and it is unrealistic to suggest they change their collective conclusion when the foreperson starts to fill out the form. In the absence of any showing of real prejudice, Fraire gives this court no reason to depart from *Wesson* and *Wilkerson*.

The verdict form presents no error of law.

*Cumulative Error*

Fraire submits that, even if this court finds errors that, in isolation, were not prejudicial, the cumulative effect of the errors shows prejudice requiring reversal.

None of Fraire's issues state errors of law. If no error exists, the cumulative error doctrine cannot apply. *State v. Lemmie*, 311 Kan. 439, 455, 462 P.3d 161 (2020). We therefore do not address cumulative error in this case.

*Lifetime Postrelease Supervision*

The trial court imposed a life sentence, with a minimum of 50 years' incarceration before parole eligibility, for Fraire's murder conviction. It also imposed lifetime postrelease supervision for that charge.

We have held that an inmate serving an off-grid indeterminate life sentence can leave prison only if the successor to the Kansas Parole Board grants the inmate parole. "Therefore, a sentencing court has no authority to order a term of postrelease supervision in conjunction with an off-grid indeterminate life sentence." *State v. Cash*, 293 Kan. 326, Syl. ¶ 2, 263 P.3d 786 (2011).

The State agrees that this portion of the sentence was erroneous.

An illegal sentence may be corrected without a new sentencing hearing. In *State v. Phillips*, 309 Kan. 475, 478, 437 P.3d 961 (2019), we referred to K.S.A. 60-2106(c), which sets out the remedies available to the Kansas Supreme Court,

17

and concluded that vacating postrelease supervision required no further proceedings at the district court level.

Accordingly, we vacate the postrelease supervision portion of Fraire's sentence. No further action by the trial court is necessary.

CONCLUSION

Fraire's convictions are affirmed. His sentence of postrelease supervision is vacated.

18