NOT DESIGNATED FOR PUBLICATION

No. 123,076

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

AURELIO RENATO MARMOLEJO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; GUNNAR A. SUNDBY, judge pro tem. Opinion filed January 7, 2022. Affirmed.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., ATCHESON, J., and RICHARD B. WALKER, S.J.

PER CURIAM: Aurelio Renato Marmolejo was convicted by a jury of his peers of two counts of rape of a child who is under 14 years of age and two counts of aggravated indecent liberties with a child who is under 14 years of age. On appeal, Marmolejo alleges: (1) The district court erred by not declaring a mistrial after a disturbance in the courtroom; (2) the prosecution erred in closing argument when it made improper comments concerning certain evidence presented at trial and the credibility of the victims; (3) cumulative error; and (4) K.S.A. 2020 Supp. 21-5503(a)(3), rape of a child who is under 14 years of age, and K.S.A. 2020 Supp. 21-5506(b)(3)(A), aggravated indecent liberties with a child who is under 14 years of age, are facially unconstitutional

1

as they violate section 1 and section 5 of the Kansas Constitution Bill of Rights. After a careful review of the record, while we agree the prosecution erred with its comments concerning certain evidence presented at trial, we find no reversible error in the conduct of the trial, nor do we find the statutes in question unconstitutional. Thus, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2015, D.C. and her family were at the house of her mother's friend. One of D.C.'s brothers witnessed D.C. cutting herself with a safety pin after she heard a discussion about the mother's friend getting married and wearing a white wedding dress. D.C.'s mother left her friend's house with her children and confronted D.C. on the car ride home. D.C. told her mother that her mother did not "know what it feels like to be raped." D.C. reluctantly informed her mother that Marmolejo, her mother's relative, had sexually abused her.

After learning of the sexual abuse, D.C.'s mother drove to Marmolejo's parents' house to confront him. When they arrived, Marmolejo was absent, but his father was there. Marmolejo returned home shortly after, and D.C.'s mother made D.C. tell Marmolejo what he had done. Crying, D.C. told Marmolejo, "You know what you did to me." Marmolejo denied doing anything and drove away.

D.C.'s mother took her to the hospital. Due to the passage of time since the incidents allegedly occurred, no sexual assault exam was performed.

D.C. underwent a Safetalk interview in January 2016. During the interview, D.C. explained she was reluctant to participate in the criminal case because she did not want to cause family trouble. D.C. admitted that, before the interview, she had never told anyone the entire story of what happened.

2

The sexual abuse happened when D.C. was staying at Lydia Avendano's house in the spring or summer of 2013 for two weeks while D.C.'s mother was going through some hardships. Avendano was Marmolejo's on-again-off-again girlfriend. D.C. disclosed Marmolejo sexually abused her daily during the second week she stayed with him. D.C. also revealed that Marmolejo showed her pornography. D.C. was 11 years old at the time of the abuse that included separate incidents of penile and digital penetration.

At trial, D.C. initially denied Marmolejo penetrated her vagina. She admitted it was difficult for her to answer the question because the abuse was not something she wanted to remember and think about. D.C. acknowledged she disclosed Marmolejo's penis penetrated her vagina in the Safetalk interview and confirmed she was truthful in that interview. D.C.'s brother testified he did not think she had been raped but admitted he might not know all the details of the abuse. D.C.'s grandmother testified that D.C. told her no intercourse occurred.

After her stay at Avendano's house, D.C. began to get into trouble at school. After she disclosed the sexual assault, D.C. twice attempted suicide. D.C. was checked into the hospital twice for self-harm, and both hospital reports mentioned that D.C. disclosed being sexually abused.

Y.B. is Marmolejo's relative, and Y.B. and D.C. knew each other but were not close. After learning of D.C.'s allegations, Y.B.'s mother asked Y.B. if Marmolejo had ever done anything to her. In March 2017, Y.B. admitted Marmolejo had sexually assaulted her three times about three years earlier. Two of the assaults occurred in his car; the third assault was at his house. Y.B.'s mother called the police.

During the trial, the State also presented K.S.A. 2015 Supp. 60-455(d) evidence from D.C.'s mother and from L.L., another relative of Marmolejo. D.C.'s mother testified

that Marmolejo had sexually touched her multiple times about 30 years ago when the two were children.

L.L.'s allegations came to light after L.L. read a Facebook post in 2017 by D.C.'s mother. L.L. is 10 years younger than Marmolejo. When L.L. was 14, she often went to Marmolejo's house. L.L. described two separate occasions one or two weeks apart when Marmolejo sexually assaulted her. After the second assault, L.L. never returned to his house.

Marmolejo believed D.C. may have made up her allegations because Avendano kicked D.C. out of her house. Marmolejo believed Y.B. was making stuff up based on a movie she saw with him. He believed Y.B.'s parents were conspiring to get Marmolejo out of their life due to an incident at a 2005 basketball game where Y.B.'s father broke Marmolejo's neck. He also guessed Y.B. made up having sex with him to hide from her parents the fact that she was having sex with her boyfriend. Marmolejo testified that his mother told him L.L. would do anything to get Marmolejo prosecuted.

Avendano testified that D.C. slept in her room while D.C. stayed at her house, and she never saw D.C. leave to sleep elsewhere. She admitted it was possible D.C. and Marmolejo had contact while she was asleep.

Marmolejo was convicted of rape and aggravated indecent liberties against D.C. and rape and aggravated indecent liberties against Y.B. Marmolejo was sentenced to two consecutive hard 25 life sentences for the two rape convictions, with the sentences for the aggravated indecent liberties convictions running concurrent.

Marmolejo timely appeals.

I.    DID THE DISTRICT COURT ERR WHEN IT DENIED MARMOLEJO'S MOTION FOR A
      MISTRIAL?

At the conclusion of the cross-examination of Y.B.'s mother, the following
interruption occurred:

> "UNIDENTIFIED SPEAKER: Wow, we're on trial.
> "(Whereupon, someone in the [gallery] claps.)
> "[DEFENSE COUNSEL]: Oh, Judge, we have someone clapping and someone,
> you know, yelling out.
> "THE COURT: I saw this gentleman here with the—
> "UNIDENTIFIED SPEAKER: I wasn't—
> "[DEFENSE COUNSEL]: No, he was clapping.
> "THE COURT: No, you were clapping. So you'll be excused at this time from the
> courtroom.
> "UNIDENTIFIED SPEAKER: For the whole court [sic]?
> "THE COURT: For the rest of the duration of the trial. I was real specific—
> "UNIDENTIFIED SPEAKER: It wasn't him that was clapping, sir. It was me. I
> can leave. It was me.
> "THE COURT: All right. Both of you will leave.
> Okay. You're excused as a witness at this time. Thank you for appearing today.
> "UNIDENTIFIED SPEAKER: You're going to get what the fuck you got coming
> to you."

The man was identified as Y.B.'s father. The parties did not identify the woman
who claimed to be the one clapping. Following the disruption, Marmolejo moved for a
mistrial, asserting the jury's attention was drawn to Y.B.'s father. Marmolejo asked for
additional time to argue the issue, but the district judge denied the request, stating he was
about the same distance from Y.B.'s father as the jury was and he could not hear what
was said. The district court indicated it would admonish the jurors not to consider the

actions or words spoken by Y.B.'s father, and that, coupled with the removal of Y.B.'s father, was sufficient.

Following the bench conference, the district court instructed the jury:

"All right. We had a brief discussion. Obviously, I asked two people to leave the courtroom because I previously said let's behave ourselves. This is not Arrowhead. This is a courtroom. And we expect them to be courteous to the Court and to the people who are here. They were less than courteous. And so they were asked to leave. There was some comment made. I couldn't hear exactly what was said. You may have heard what was said. But what I wanted to address to you is that you should disregard any comments or behavior of the audience. We will keep this in a very formal and careful environment so that we hear the case accurately and not be influenced by any behavior of other—the audience. So I would ask that you disregard any comments or behavior that you may have observed or heard as those people were asked to leave the courtroom. And I will continue to remind them that they should be on their best behavior here."

Marmolejo first argues the outburst from Y.B.'s father prejudiced the jury against him and prevented him from receiving a fair trial. Marmolejo also claims the district court implicitly found a fundamental failure in the proceeding when it removed Y.B.'s father and issued a curative instruction to the jury. Marmolejo further argues the outburst infringed upon his right to present his defense and presupposed his guilt. He asserts the district court's curative instruction was insufficient because it only told the jury it *should* disregard the comments.

The State believes the lack of a finding regarding a fundamental failure does not establish there was a fundamental failure in the proceedings. The State argues there is no evidence the jury even heard the statement and contends the district court's curative instruction, coupled with the traditional instruction to decide the case based only on the

6

evidence admitted plus the overwhelming evidence presented, is sufficient to establish there was no prejudice from the comments of Y.B.'s father.

*Standard of Review*

A district court may end a trial and declare a mistrial at any time it finds the termination necessary because "[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." K.S.A. 22-3423(1)(c). We review the decision to deny a motion for mistrial for abuse of discretion. Our analysis is two-fold. First, we ask whether the district court abused its discretion in deciding whether a fundamental failure in the proceeding existed. Then, we analyze whether the district court abused its discretion when deciding whether the conduct caused prejudice that could not be cured or mitigated by an admonition or jury instruction, resulting in an injustice. *State v. Fraire*, 312 Kan. 786, 789, 481 P.3d 129 (2021). A district court abuses its discretion when it takes an action "that is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact." *State v. Logsdon*, 304 Kan. 3, 27, 371 P.3d 836 (2016).

*Analysis*

When evaluating a motion for a mistrial based on prejudicial conduct inside the courtroom, a district court must first decide "whether the prejudicial conduct created a fundamental failure in the proceeding. If it did, the district court next decides whether the prejudicial conduct made it impossible to continue the proceeding without denying the parties a fair trial." *Fraire*, 312 Kan. at 790. Whether a fundamental failure in the proceeding occurred "'varies with the nature of the alleged misconduct, such as whether the allegation is based on the actions of a witness, the actions of a bystander, prosecutorial [error], or evidentiary error.'" *State v. Moore*, 302 Kan. 685, 693, 357 P.3d 275 (2015).

7

"Trial courts have a duty to maintain order and ensure that justice is not obstructed by a person or persons. Emotional outbursts and demonstrations often occur, particularly in [high-stakes] cases. Nevertheless, emotional outbursts, weeping, fainting, applause, or other demonstrations can prejudice a defendant's right to a fair trial." *State v. McCullough*, 293 Kan. 970, 998, 270 P.3d 1142 (2012). District courts have broad discretion to determine whether the jury was, or could have been, influenced by a disturbance. That discretion will not be disturbed by us absent prejudice. 293 Kan. at 998.

Here, the district court never made an explicit finding that a fundamental failure occurred after Y.B.'s father's outburst. Marmolejo claims the district court implicitly found a fundamental failure when it took remedial action to remove Y.B.'s father from the courtroom for the remainder of the trial and to issue a curative instruction to the jury. According to Marmolejo, this first prong was easily met. The State argues the district court made no such finding and the district court's actions should not be equated to a finding of a fundamental failure.

The record does not tell us whether the jury heard the outburst from Y.B.'s father or whether the district court found a fundamental failure occurred. But the district court proceeded as though one occurred, issuing a curative instruction to the jury. Thus, we will assume, without deciding, that a fundamental failure occurred. See *State v. Kleypas*, 305 Kan. 224, 283, 382 P.3d 373 (2016) ("While we question whether giving an admonishment necessarily means a fundamental failure occurred [especially given the court's comments], given the State's concession, we will proceed on the assumption the court found a fundamental failure occurred."); see also *State v. Sean*, 306 Kan. 963, 989, 399 P.3d 168 (2017) ("However, the trial judge went on to address the second step in considering a motion for mistrial when he offered to give a jury admonishment or limiting instruction. Because this step is necessary only when there was a fundamental failure in the trial, we assume the trial court determined the gang reference constituted a fundamental failure in the proceedings."); *State v. Davis*, No. 119,921, 2019 WL

5090467, at *3 (Kan. App. 2019) (unpublished opinion) (explicit use of phrase "'fundamental failure'" unnecessary as district court's analysis can imply it).

"Under the second step, the court considers whether the conduct caused prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice. [Citation omitted.]" *Fraire*, 312 Kan. at 790. This prong requires the district court to determine "'whether the prejudicial conduct made it impossible to continue the proceeding without denying the parties a fair trial. . . . The degree of certainty required to conclude an injustice did not occur varies depending on whether the fundamental failure infringes on a constitutional right or not.' [Citations omitted.]" *State v. Sherman*, 305 Kan. 88, 119, 378 P.3d 1060 (2016).

In *Kleypas*, at a penalty phase hearing in this capital case, a courtroom bystander—the victim's father—attacked Kleypas in front of the jury. The jury was quickly ushered out of the courtroom so order could be restored. In chambers, Kleypas' counsel requested a mistrial. The district court decided to address the jury about the interruptions and continue with the trial.

The Kansas Supreme Court rejected Kleypas' prejudice argument "because the district court admonished the jury to disregard the altercation—to treat it as if it never happened." 305 Kan. at 279. The *Kleypas* court noted juries are generally presumed to follow a court's instruction and the defendant has the burden to come forward with some evidence to overcome the presumption. 305 Kan. at 279.

Here, the district court also instructed the jury to disregard the incident. Admittedly, the district court in *Kleypas* took the additional step of asking the jurors whether they could set aside the incident and consider the case fairly and impartially. That did not happen here; however, our Supreme Court has not indicated this was a

9

required step, yet it did consider this as part of the totality of evidence it could consider when determining if the defendant had been prejudiced. See 305 Kan. at 279.

Marmolejo also quibbles with the language of the district court's admonishment. Marmolejo complains the district court used the word "should" instead of "must," suggesting the instruction was just an encouragement and optional rather than mandatory. We disagree. Admittedly, the district court's instruction is cloaked in polite language rather than as a strict command to the jury. But no matter how the district court phrased its admonishment, it did instruct the jury to "disregard any comments or behavior that you may have observed or heard as those people were asked to leave the courtroom." This admonishment, coupled with the jury instruction to consider only the admitted evidence, was a sufficiently curative instruction.

Thus, the jury instruction corrected any fundamental failure in the proceeding caused by Y.B.'s father's outburst, and there was no prejudice preventing a fair trial. The evidence here was strong. D.C. and Y.B. both testified to separate incidents where Marmolejo sexually assaulted them. Their testimony conformed to the admitted DVD interviews where they described the sexual assaults. And D.C.'s mother and L.L. testified to similar incidents perpetrated by Marmolejo when they were at similar ages to D.C. and Y.B.

In stark contrast, our review of the record reveals that Marmolejo's defense was unpersuasive and bizarre. Marmolejo claimed D.C. made up her allegations to get back at Marmolejo because Avendano kicked D.C. out of her apartment several years earlier. He testified Y.B. invented her allegations because there was bad blood between her family and him, including when Y.B.'s father broke Marmolejo's neck at a pickup basketball game. Marmolejo claimed his mother told him L.L. would make up anything to get him sent to prison. Marmolejo even introduced photographs of his penis to prove he had a

10

black extra-large penis, supposedly to contradict Y.B.'s claim that Marmolejo's penis was white.

The interruption from Y.B.'s father did not take away from the strength of the State's case. If anything, it helped Marmolejo because part of his defense was family strife led to the accusations. See, e.g. *Fraire*, 312 Kan. at 791 ("As the State has suggested, it is equally possible that, if the clothing produced any prejudicial effect, it was to Fraire's benefit.").

In light of the entire record, we conclude beyond a reasonable doubt the district court did not abuse its discretion. The statements from Y.B.'s father had no reasonable possibility of affecting the jury's weighing of the evidence and ultimate guilty verdict.

II.     DID THE STATE COMMIT PROSECUTORIAL ERROR IN CLOSING ARGUMENT?

Marmolejo also claims the prosecutor erred twice in his closing argument:  First, when the prosecutor discussed D.C.'s reaction to the white wedding dress and mentioned the traditional connection between wearing a white wedding dress and virginity; and second, when the prosecutor discussed the demeanor of D.C. and Y.B. on the witness stand. Marmolejo argues these errors prejudiced him because the charges hinged on the victims' credibility and these arguments procured sympathy from the jury and prevented it from making the necessary credibility determinations.

The State responds that the reference equating the wedding dress to virginity permissibly asked the jury to rely on its common sense. The State argues that commenting on D.C.'s and Y.B.'s demeanor at trial was also proper because the comments related to their credibility and were directly tied to the evidence. Finally, any error was not prejudicial, according to the State, because the evidence in the case was strong.

11

*Standard of Review*

"This court reviews a claim of prosecutorial error under a two-step analysis. First, the court decides whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. Then, if the court finds error, it next determines whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, the court adopts the traditional constitutional harmlessness inquiry—prosecutorial error is harmless if the State can demonstrate beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record, which is to say, there is no reasonable possibility that the error contributed to the verdict. [Citation omitted.]" *Fraire*, 312 Kan. at 791-92.

*Analysis*

Before the district court, Marmolejo did not object to either challenged statement. However, we "will review a claim of prosecutorial error based on comments made during voir dire, opening statement, or closing argument even in the absence of a contemporaneous objection. We may, however, figure the presence or absence of an objection into our analysis of the alleged error." *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

A.      *The existence of error*

In deciding whether there was prosecutorial error, we must first determine whether the complained of acts fall outside the wide latitude afforded to prosecutors. *Fraire*, 312 Kan. at 791. When reviewing statements made by prosecutors, the context of the challenged statements matters. *State v. Anderson*, 308 Kan. 1251, 1261, 427 P.3d 847 (2018). Marmolejo complains about two errors made in the prosecutor's closing

12

argument: (1) the white wedding dress and (2) the credibility of D.C.'s and Y.B.'s testimony.

### 1. *The white wedding dress*

In closing argument, the prosecutor discussed the white wedding dress, which triggered D.C. to harm herself and eventually to confess Marmolejo's sexual assaults:

> "But the second thing is, when she testifies in court you might understand and imagine that she has a reason why it's difficult for her to say that one particular fact. What was it that triggered her to eventually finally come out and disclose this stuff? It was talk about the wedding. This is where you can use your common sense, talked about wearing a white wedding dress on the day of the wedding. We all know what that means. A woman wears white to her wedding when she's chaste, when she's pure, when she's a virgin. And this woman is talking about this in [D.C.]'s presence. And it's so upsetting to [D.C.] that she begins to cut herself."

Marmolejo argues these comments were well outside permissible argument, criticizing the prosecutor for referring to "the dated tradition of brides wearing white on their wedding day to symbolize they have refrained from premarital sex." Marmolejo claims this tradition has nothing to do with this case and complains the prosecutor was suggesting that one of the consequences of Marmolejo's actions was that D.C. was no longer pure.

Marmolejo also points out what he perceives as a pattern by the prosecutor of emphasizing the concept of purity, noting two witnesses were called to testify about the white wedding dress at trial—D.C.'s mother and brother—and testimony from Y.B.'s mother that Y.B. and her sisters had been baptized, which Marmolejo asserts is a religious representation of purity.

13

While we will consider the prosecutor's comments, in the absence of a contemporaneous objection by Marmelejo, we are disinclined to consider the testimony for two reasons. First, neither D.C.'s mother nor her brother made any comments relating to purity or virginity in discussing the wedding dress. Both testified about the wedding dress because D.C.'s brother discovered D.C. cutting herself after hearing about the wedding dress, eventually leading D.C. to reveal the sexual assaults to her mother and brother. The baptism evidence is even further afield. The purpose of the testimony from Y.B.'s mother was to show Marmolejo's closeness to her family. Marmolejo attended all the baptisms and is even a relative of Y.B. None of this testimony is improper or relevant to the challenged comments in closing.

But we do agree with Marmelejo that the prosecutor's comments on virginity and sexual purity were in error because "a prosecutor may not argue facts not in evidence." *Fraire*, 312 Kan. at 792. Regardless of any tradition related to white wedding dresses, none of the prosecutor's comments were based on the evidence. The evidence shows D.C. began cutting herself after viewing the wedding dress and hearing her family discuss it. There is nothing in the record about a white wedding dress representing virginity and sexual purity or that D.C. cut herself because she believed that and was upset because she was no longer pure.

2.      *D.C.'s and Y.B.'s credibility*

In rebuttal, the prosecutor discussed the emotional state of D.C. and Y.B. while testifying and their credibility:

"You can consider their demeanor to determine their credibility. You can consider [Y.B.], she appeared to be hurt. She appeared to be emotional. [D.C.], especially, appeared to be hurt, and she appeared to be emotional when she was testifying. And pain can be circumstantial evidence of an injury. If someone breaks their

14

arm, and we had to prove that in court, one of the ways we might do that is by asking the person, who broke their arm, 'How did it feel'? 'I felt my arm break. I felt pain.' And we would submit—the State would submit to you, when you saw [D.C.] testifying, and when you saw her in that video, you saw a person in pain, talking about something that was dramatic and painful for them. Now, I'm not trying to appeal to your sympathy. I'm talking to put a piece of evidence that person performed in front of your very eyes. And either she is the best actress in Shawnee County, Kansas, or, what she was saying was genuine and sincere.

"And the State would submit that the reasonable interpretation of the evidence is the latter. The reason why it was so hard for her to talk about these things, is because they're bad things for her. She doesn't want to remember them. She doesn't want to think about the time her [relative] raped her. And so it's hard for her. But that all tends to suggest that what she witnessed, and what she told you about, really happened."

A prosecutor may not express an opinion about the credibility of a witness. *Fraire*, 312 Kan. at 792. Additionally, "[c]omments from a prosecutor in closing arguments that inflame the passions or prejudices of the jury are prohibited. [Citation omitted.]" *State v. Nesbitt*, 308 Kan. 45, 56, 417 P.3d 1058 (2018).

But lawyers may "make statements during closing arguments that draw reasonable inferences from the evidence. Specifically, prosecutors may explain "'to juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses.'" . . . [I]t is proper for a prosecutor to assert 'reasonable inferences based on the evidence . . . .' [But] the jury must be left to draw the ultimate conclusion" on witness credibility. *State v. Duong*, 292 Kan. 824, 830, 257 P.3d 309 (2011).

Marmolejo made the credibility of D.C. and Y.B. the central focus of his defense, and Marmolejo's counsel attacked their credibility several times during closing argument. The challenged statement was the prosecutor's response to this attack. The prosecutor did not tell the jury how to feel or that it should find D.C. and Y.B. credible. Instead, the

15

prosecutor described the demeanor of Y.B. and, especially, D.C. when testifying. The prosecutor discussed how their emotions could be considered circumstantial evidence of injury.

The prosecutor did not express an opinion on the credibility of D.C. and Y.B., nor was his argument designed to inflame the passions or prejudices of the jury. In fact, the prosecutor made sure to tell the jurors he was not trying to appeal to their sympathy. Instead, the prosecutor described the evidence and the demeanor of two witness and concluded that the reasonable interpretation of D.C.'s and Y.B.'s demeanor was that they were telling the truth. The second challenged statement was not outside the wide latitude given to prosecutors. The prosecutor did not err.

B.     *Prejudice*

As we have already indicated, the prosecutor's discussion of the white wedding dress and its connection to virginity and sexual purity was in error. Accordingly, we must determine whether that error prejudiced Marmolejo. See *Fraire*, 312 Kan. at 792.

> "When assessing prejudice, '"[t]he focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry."' We may also consider the presence or absence of a defendant's objection in our analysis. [Citations omitted.]" *Bodine*, 313 Kan. at 411.

The discussion of the white wedding dress and its traditional connection to virginity and sexual purity did not prejudice Marmolejo. The prosecutor's comments had no relation to the evidence showing Marmolejo committed the charged acts against D.C. or Y.B. Instead, the prosecutor was explaining why D.C. revealed Marmolejo's sexual assaults against her several years after they occurred. The comments had little impact on whether Marmolejo was guilty.

Additionally, though not dispositive, Marmolejo did not object to the comments at trial. In fact, Marmolejo's counsel discussed the tradition of the white wedding dress in her own closing argument. In short, Marmolejo did not register an issue with the white wedding dress comments at trial, and his attorney took the opportunity to argue before the jury why that tradition was irrelevant. Given the strength of the evidence against Marmolejo, we see no prejudice as there is no reasonable possibility the error contributed to the guilty verdict.

III.    WAS THERE CUMULATIVE ERROR?

Marmolejo argues that even if the errors in his first two issues did not require reversal, their cumulative nature does.

When considered collectively, cumulative error "'may be so great as to require reversal of a defendant's conviction.'" *State v. Hirsh*, 310 Kan. 321, 345, 446 P.3d 472 (2019). We review de novo "whether the totality of circumstances substantially prejudiced a defendant and denied the defendant a fair trial based on cumulative error." *State v. Brown*, 298 Kan. 1040, 1056, 318 P.3d 1005 (2014).

Here, only one error occurred—the prosecutor's discussion of the white wedding dress and its representation of virginity and sexual purity. That one error is insufficient to establish cumulative error. *State v. Lemmie*, 311 Kan. 439, 455, 462 P.3d 161 (2020).

IV.    DO K.S.A. 2020 SUPP. 21-5503(a)(3) AND K.S.A. 2020 SUPP. 21-5506(b)(3)(A) VIOLATE SECTION 5 OF THE KANSAS CONSTITUTION BILL OF RIGHTS?

For the first time on appeal, Marmolejo argues K.S.A. 2020 Supp. 21-5503(a)(3) (rape of a child under age 14) and K.S.A. 2020 Supp. 21-5506(b)(3)(A) (aggravated indecent liberties with a child under age 14) are facially unconstitutional under section 5

17

of the Kansas Bill of Rights because neither require the State to prove Marmolejo knew the ages of the victims. Marmolejo argues the lack of a mental state requirement for the age of the victim makes the statutes strict liability crimes and violate his section 5 right to a jury trial which requires the State to prove a culpable mental state for all elements of the crime.

*Standard of Review*

The constitutionality of a statute is a legal question reviewed de novo. When a case deals with "'fundamental interests'" protected by the Kansas Constitution, no presumption of constitutionality applies to the challenged statutes. *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1132, 442 P.3d 509 (2019). The right to a jury trial protected by section 5 of the Kansas Constitution Bill of Rights is a "'fundamental interest,'" and no presumption of constitutionality applies to challenges brought under section 5. 309 Kan. at 1133.

*Section 5 of the Kansas Constitution Bill of Rights*

At the outset, we note that the parties spend time disputing whether this issue was properly preserved as Marmolejo failed to raise this issue below. Given the facial nature of Marmolejo's constitutional challenge, we will presume the issue has been properly preserved and presented.

"The right of trial by jury shall be inviolate." Kan. Const. Bill of Rights, § 5. Our Supreme Court has "interpreted the word 'inviolate' as used in section 5 to mean 'not disturbed or limited.' *In re Rolfs, Petitioner*, 30 Kan. 758, 762, 1 P. 523 (1883)." *State v. Albano*, 313 Kan. 638, 646, 487 P.3d 750 (2021). Another panel of our court, citing to *Albano*, has stated that what is protected in section 5 "is the division of decision-making between a jury and the district court." *State v. Spackman*, No. 122,021, 2021 WL

4929156, at *3 (Kan. App. 2021) (unpublished opinion), *petition for rev. filed* November 22, 2021. In a criminal case, the jury is called upon to decide the facts while the district court determines matters of law and imposes punishment upon a guilty verdict. "What § 5 protects is the fact-finding function itself, not the crime-specific elements to be found." 2021 WL 4929156, at *3.

Moreover, section 5 "'does not require every trial to be by jury. Nor does it contemplate that every issue, which, by the laws in force at the adoption of the constitution of the state, was triable by jury, should remain irrevocably triable by that tribunal.' *Kimball and others v. Connor, Starks and others*, 3 Kan. 414, 432, 1866 WL 430 (1866). Instead, '[s]ection 5 preserves the jury trial right as it historically existed at common law when our state's constitution'" was adopted in 1859. *Albano*, 313 Kan. at 640-41. Generally, section 5 is interpreted separately from the Sixth Amendment to the United States Constitution, though they may provide the same protections in some cases. See 313 Kan. at 645-46.

*Marmolejo's Constitutional Challenges*

Marmolejo attacks as facially unconstitutional K.S.A. 2020 Supp. 21-5503(a)(3), defining rape as "sexual intercourse with a child who is under 14 years of age," and K.S.A. 2020 Supp. 21-5506(b)(3)(A), defining aggravated indecent liberties with a child under age 14 as:

> "engaging in any of the following acts with a child who is under 14 years of age:
>> "(A) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both."

Marmolejo argues because neither statute requires the State to prove that he knew the age of the victim, making both statutes strict liability crimes, they violate section 5.

Generally, for conduct to be criminal,

"'some sort of bad state of mind is required . . . .'
"But some conduct is criminal even without a guilty state of mind. K.S.A. 2020 Supp. 21-5203(b) explicitly permits the criminalization of conduct regardless of the actor's mental state 'if the crime is . . . a felony and the statute defining the crime clearly indicates a legislative purpose to impose absolute liability for the conduct described.'" *State v. Dinkel*, 314 Kan.146, 156, 495 P.3d 402 (2021).

More specifically, Kansas law does not require "that the accused had knowledge of the age of the minor, even though age is a material element of the crime with which the accused is charged." K.S.A. 2020 Supp. 21-5204(b); *State v. Jones*, 271 Kan. 201, 203-04, 21 P.3d 569 (2001).

*K.S.A. 2020 Supp. 21-5503(a)(3)*

Our Supreme Court recently held that the rape of a child under 14 years of age, as defined by K.S.A. 2020 Supp. 21-5503(a)(3), contains no mental culpability requirement, making it a strict liability crime. *Dinkel*, 314 Kan. at 160; see also K.S.A. 2020 Supp. 21-5202(g) ("If the definition of a crime prescribes a culpable mental state with regard to a particular element or elements of that crime, the prescribed culpable mental state shall be required only as to specified element or elements, and a culpable mental state shall not be required as to any other element of the crime unless otherwise provided.").

The State does not dispute the strict liability nature of rape of a child under 14 years of age but claims Marmolejo is wrong to categorize aggravated indecent liberties similarly as the acts prescribed by this crime must be "done or submitted to with the

intent to arouse," creating a mens rea element, meaning aggravated indecent liberties is not a strict liability crime.

*Dinkel* and the language in K.S.A. 2020 Supp. 21-5202(g) suggest aggravated indecent liberties is a strict liability crime as well. Aggravated indecent liberties "done or submitted to with the intent to arouse" requires that the act be done intentionally. K.S.A. 2020 Supp. 21-5506(b)(3)(A). But the requirement that the victim be a child under 14 years of age contains no required mental state. Even though the crime of aggravated indecent liberties contains a culpable mental state, there is no requirement that the State prove the defendant had knowledge of the victim's age, making it a strict liability crime as well. See K.S.A. 2020 Supp. 21-5506(b)(3)(A); K.S.A. 2020 Supp. 21-5202(g); *Dinkel*, 314 Kan. at 160.

Whether a crime is a strict liability one or whether just the age element has a strict liability requirement, "the Legislature has the authority to create strict liability crimes." *State v. Genson*, 59 Kan. App. 2d 190, 202, 481 P.3d 137 (2020), *rev. granted* 313 Kan. 1043 (2021). When the Legislature creates a strict liability crime, the doing of the prohibited act constitutes a crime, and any mental state of the act's criminal character is immaterial on the question of guilt. "'There is no constitutional objection to such legislation, the necessity for which the Legislature is authorized to determine.' *State v. Brown*, 38 Kan. 390, 393, 16 P. 259 (1888). [Citations omitted.]" *Genson*, 59 Kan. App. 2d at 202-03. While the Legislature has the authority to create elements of an offense, "it 'must act within any applicable constitutional constraints in defining criminal offenses.'" 59 Kan. App. 2d at 203.

Our territorial statutes criminalized rape as "carnally and unlawfully knowing any female child under the age of ten years." Kan. Terr. Stat. 1855, ch. 48, § 26. Later, after statehood, the age in the statute was changed to "'any female under the age of eighteen years.'" *State v. Crawford*, 39 Kan. 257, 259, 18 P. 184 (1888). The *Crawford* court held:

21

"Carnal knowledge of a female under the age of eighteen years is in itself rape; that is, force, threats, or fraud, and want of consent, need not be averred or established." 39 Kan. at 259.

Except for the age changing from 10 to 18, the "statutory" rape section of the statute was the same as it was before the amendment in 1887. In *State v. White*, 44 Kan. 514, 514-16, 25 P. 33 (1890), our Supreme Court heavily criticized the age change for denoting certain conduct which would not be rape but for the statutory raising of the age. The male defendant in *White* challenged the statute as violating section 9 of the Kansas Bill of Rights' prohibition on cruel and unusual punishment and for being "in conflict with the spirit of the bill of rights generally; and is in violation of common sense, common reason, and common justice . . . ." 44 Kan. at 516-17. The *White* court held the rape statute did not violate the Kansas Constitution. 44 Kan. at 521.

Other early cases also addressed the statutory rape provision. In *Wiebe v. Hudspeth*, 163 Kan. 30, 34, 180 P.2d 315 (1947), our Supreme Court held all the State had to prove for a conviction was fornication and that the female was under the age of 18. In *State v. Hansford*, 81 Kan. 300, 303, 106 P. 738 (1909), the Supreme Court noted there are some crimes "where the manner in which they are committed is material and important as indicating the existence of malice, intent, deliberation or some other element of the offense charged." But statutory rape is not in that class of crimes. The *Hansford* court upheld a conviction when the defendant and several witnesses had testified to statements made by the victim that she was older than 18 when the sexual intercourse occurred. 81 Kan. at 304.

The territorial statute did not require the defendant's knowledge of the age of the victim for statutory rape. Although the age was changed in 1887 from 10 to 18, the substance of the statute remained the same. As the early cases show, statutory rape required no mental state. Thus, having sex with a female under 18 was rape. *Crawford*,

22

39 Kan. at 259. Though the age has changed to 14 and the gendered language has been removed, K.S.A. 2020 Supp. 21-5503(a)(3) retains the same substance of the territorial law.

Because section 5 preserves the right to a jury trial as it existed at the time the Kansas Constitution was adopted in 1859, and because there was no right to require the State prove to a jury the accused knew the age of the victim to convict that person of rape, K.S.A. 2020 Supp. 21-5503(a)(3) is not facially unconstitutional under section 5.

*K.S.A. 2020 Supp. 21-5506(b)(3)(A)*

The same analysis as above applies to Marmolejo's next constitutional challenge. Although aggravated indecent liberties with a child under 14 years of age does not have the same historical pedigree as statutory rape, both crimes possess a similar age element. See K.S.A. 2020 Supp. 21-5506(b)(3)(A); K.S.A. 2020 Supp. 21-5503(a)(3). If the State did not have to prove to a jury the accused knew the age of the victim according to the law on statutory rape in existence at the time the Kansas Constitution was ratified, it follows that section 5 also does not command that the State prove the accused's knowledge of the age of a victim of aggravated indecent liberties of a child under 14 years of age. K.S.A. 2020 Supp. 21-5506(b)(3)(A) is also not facially unconstitutional under section 5.

V.    DO K.S.A. 2020 SUPP. 21-5503(a)(3) AND K.S.A. 2020 SUPP. 21-5506(b)(3)(A) VIOLATE SECTION 1 OF THE KANSAS CONSTITUTION BILL OF RIGHTS?

Finally, and for the first time on appeal, Marmolejo argues K.S.A. 2020 Supp. 21-5503(a)(3) (rape) and K.S.A. 2020 Supp. 21-5506(b)(3)(A) (aggravated indecent liberties) are facially unconstitutional and infringe on his fundamental right to liberty under section 1 of the Kansas Constitution Bill of Rights because they do not require

23

mens rea as to the age of the victim. Marmolejo's argument relies on the Supreme Court's holding in *Hodes & Nauser, MDs, P.A. v. Schmidt*, 309 Kan. 610, 440 P.3d 461 (2019). Marmolejo asserts criminal statutes must survive strict scrutiny and these statutes cannot.

*Standard of Review*

Again, whether a statute is constitutional is a legal question reviewed de novo. *Hilburn*, 309 Kan. at 1132. No presumption of constitutionality applies to a statute if that statute is subject to strict scrutiny. *Hodes & Nauser*, 309 Kan. 610, Syl. ¶ 21.

*Analysis*

Like his section 5 challenge, Marmolejo did not raise this issue before the district court, and both parties argue whether Marmolejo's section 1 challenge is properly before us. However, because Marmolejo raises a facial challenge, we will presume this issue has been properly preserved and presented.

"All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." Kan. Const. Bill of Rights, § 1. Marmolejo claims he has a fundamental right to liberty and "personal autonomy" under section 1. Marmolejo's issue with K.S.A. 2020 Supp. 21-5503(a)(3) and K.S.A. 2020 Supp. 21-5506(b)(3)(A) again flows from their lack of a requirement that he know the age of the victim. Because criminal statutes have the potential to restrict a person's liberty via incarceration or otherwise, Marmolejo asserts all criminal statutes must satisfy strict scrutiny before a person's liberty may be restricted and contends these statutes fail such a test. In response, the State argues there is no protected liberty right to sexually abuse children, making a strict scrutiny standard inapplicable.

24

Marmolejo's argument that all criminal statutes must satisfy strict scrutiny is almost entirely based on the Kansas Supreme Court opinion in *Hodes & Nauser*. Except *Hodes & Nauser* does not address criminal law; it addresses abortion. While the Supreme Court did adopt the strict scrutiny test to analyze the right under section 1, that test was specifically applied to the right to abortion, which the majority found protected by section 1. 309 Kan. at 667-68.

Marmolejo provides no support beyond his citations to *Hodes & Nauser* for why all criminal statutes are subject to strict scrutiny. This failure to provide pertinent authority results in its waiver. See *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019). Additionally, he only makes general claims to a liberty interest and a right to be free from incarceration. Marmolejo again provides no legal support, nor does Marmolejo specify a protected class or fundamental right that is at issue which would subject the statutes to strict scrutiny. Either he generally means criminals as a whole—who do not enjoy strict scrutiny protection in every instance, or he means defendants who have sexual interactions with minors—which is not a protected class at all. A party bringing a section 1 challenge cannot merely allege a liberty interest and claim strict scrutiny review; the party must show he or she has a fundamental right subject to strict scrutiny review. See *State v. McKinney*, 59 Kan. App. 2d 345, 358, 481 P.3d 806, *rev. denied* 313 Kan. 1046 (2021).

But even if we were to assume that Marmolejo was asserting a protected liberty interest deserving of strict scrutiny, protecting children under the age of 14 from sexual exploitation at the hands of adults strikes us as a compelling governmental interest because young children lack the maturity to make informed decisions about sexual activity. See *State v. Voyles*, 284 Kan. 239, 259, 160 P.3d 794 (2007) (protecting well-being of children from adult sexual predators is legitimate State goal); *Spackman*, 2021 WL 4929156, at *3 (same). Moreover, as the *Spackman* panel explained, the lack of a culpable mental state or not requiring the State to prove the defendant had knowledge of

the age of the victim is narrowly tailored to protect the State's compelling interest in protecting children because statutory rape laws—and, by extension, similar aggravated indecent liberties statutes—"place the risk of error on the adult and thus deter sexual conduct if there is doubt about the other participant's age." 2021 WL 4929156, at *3. A narrowly tailored statute does not have to require an adult to have actual knowledge of a sexual partner's age "where the regulated conduct is itself socially undesirable and commands no constitutional protection." 2021 WL 4929156, at *3.

Accordingly, we have no trouble concluding K.S.A. 2020 Supp. 21-5503(a)(3) and K.S.A. 2020 Supp. 21-5506(b)(3)(A) survive constitutional scrutiny under section 1 as they are both narrowly tailored to protect a compelling governmental interest. Moreover, they bear a rational relationship to the State's legitimate interest in protecting children by punishing those who sexually assault them. See *Hodes & Nauser*, 309 Kan. at 663 (rational basis test requires "only that the legislative enactment bear some rational relationship to a legitimate state interest."). The statutes do not violate section 1.

Affirmed.

26